**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 20-95-DLB-EBA**

**YOSAUN SMITH**                                                                                      **PLAINTIFF**


**v.**                                    **MEMORANDUM OPINION AND ORDER**


**COMMONSPIRIT HEALTH, et al.**                                          **DEFENDANTS**

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

Plaintiff Yosaun Smith is a former employee of Defendant CommonSpirit Health, a large, not-for-profit corporation that provides hospital services across the United States. As part of her employment with CommonSpirit, Smith paid into an employer-sponsored 401(k) plan. Acting on behalf of a putative class of similarly-situated individuals, Plaintiff brings this action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), alleging that the committee overseeing CommonSpirit's 401(k) retirement savings plan breached its fiduciary duty to its members by providing an inadequate selection of investment options and by allowing for unreasonable expenses to be charged for the administration of the plan. Defendants have moved to dismiss the Complaint in its entirety, arguing that Plaintiff lacks Article III standing as to one of her claims and that her Complaint as a whole fails to state a claim upon which relief may be granted. (Doc. # 38). Plaintiff has filed a response and Defendants have filed a reply. (Docs. # 43 and 49). In addition, the parties have filed multiple notices of supplemental authority along with responses. A telephonic oral argument was held on August 25, 2021.

(Docs. # 75 and 76).  Accordingly, the Motion to Dismiss is ripe for the Court's review.  As discussed below, Plaintiff has not alleged facts from which the Court can infer imprudent conduct on the part of the Defendants.  Thus, Plaintiff has failed to state a claim under ERISA and Defendants' Motion to Dismiss is **granted**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

CommonSpirit offers its employees the opportunity to invest in a retirement plan ("the Plan"), in which participants may direct their contributions (and employer matching contributions) into various investments options offered by the Plan, such as mutual funds and brokerage accounts.  (Doc. # 1 ¶ 16).  The Plan is a qualified tax-deferred, defined contribution plan under Internal Revenue Code § 401, 26 U.S.C. §§ 401(a)(k).  (*Id.* ¶¶ 2, 16).  With over 100,000 thousand participants and total investments exceeding $3.2 billion, the Plan is one of the largest of its kind in the country.  (*Id.* ¶ 4).

As the Plan Sponsor and fiduciary charged with administering the Plan, CommonSpirit assembled the Administration Committee ("the Committee") and appointed its individual members to administer the Plan on CommonSpirit's behalf.  (*Id.* ¶¶ 5, 10-12).  During the relevant period, the Committee retained Fidelity Management Trust Company to hold the Plan's assets.  (*Id.* ¶ 18).  In exchange for its services, Fidelity charged recordkeeping fees that were paid by Plan participants through a deduction in investment income.  (*Id.* ¶ 16).  Each participant's account is charged with the amount of distributions taken and allocation of administrative expenses.  (*Id.*).

Plaintiff is a former employee of CommonSpirit and a participant in the Plan.  (*Id.* ¶ 9).  The gravamen of her Complaint is that Defendants violated their fiduciary duties of prudence and loyalty under 29 U.S.C. § 1104(a) by (1) selecting investment funds with

higher fees and subpar performance, (2) offering an investment menu that was more expensive than that of comparable plans, and (3) allowing the Plan to pay excessive recordkeeping fees to Fidelity.  (*Id.* ¶¶ 19-49, 71).  Plaintiff's allegations cover the time period from July 2, 2014 to the present.  (*Id.* ¶ 56).

Plaintiff alleges numerous facts in support of her claims.  For instance, Plaintiff claims that Defendants included actively managed mutual funds in the menu of funds for participants to invest in while excluding lower-cost and better-performing passively managed funds.  In an actively managed fund, fund managers hand select stocks or bonds in an attempt to outperform the market. (*Id.* ¶ 26).  In contrast, passively managed funds do not make any independent investment choices and instead simply track a designated market benchmark or index. (*Id.* ¶ 25).  Plaintiff identifies in particular the Fidelity Freedom Funds, a suite of thirteen funds that are actively managed by Fidelity fund managers (hereinafter referred to as the "Active Suite").   Given the active involvement of fund managers, the Active Suite naturally has higher operating costs as compared to Fidelity's passively managed index funds (hereinafter referred to as the "Index Suite").  (*Id.* ¶¶ 21, 31).   These operating costs, comprised of investment management fees and trading costs, "are generally expressed as an expense ratio: the amount of fees charged as a percentage of the total assets invested.  The size of the expense ratio varies based on a host of factors unique to each investment, such as the size of the fund, the frequency of trading, and the complexity of its holdings." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020) (citing Emp. Benefits Sec. Admin., U.S. Dep't of Labor, Understanding Retirement Plan Fees and Expenses 4, 9 (Dec. 2011)).  As alleged in the Complaint, while the expense ratio for the Index Suite

was a mere 0.08%, the expense ratio for the funds in the Active Suite ranged from range from 0.42% to 0.65% for the K Share class, which the Plan used until 2018, and 0.37% to 0.49% for the K6 share class, which the Plan used thereafter.  (Doc. # 1 ¶ 31).  To illustrate the difference in costs, Plaintiff asserts that Plan participants who invested in the Active Suite would have collectively saved over $1.24 million in fees in 2018 alone had they invested in the Index Suite instead.  (*Id.* ¶¶ 31-33).

In addition to being more expensive, the Active Suite, as alleged in the Complaint, has significantly underperformed the Index Suite on a three-year and five-year trailing basis since 2014.  (*Id.* ¶¶ 36-37).  On top of this, Plaintiff alleges that the Active Suite has consistently been rated lower than the Index Suite by the rating agency Morningstar.  (*Id.* ¶ 35).  Plaintiff also cites a 2019 report purportedly showing rising investor demand for Fidelity's Index Suite and falling demand for the Active Suite.  (*Id.* ¶ 34).  Thus, in Plaintiff's view, "[a] simple weighing of the benefits of the two suites indicates that the Index suite is a far superior option, and, consequently, the more appropriate choice for the Plan."  (*Id.* ¶ 21).

The Complaint does not allege which fund(s), if any, Plaintiff herself invested in, but does claim that at least 76% of the Plan's assets were invested in the Active Suite.  (*Id.* ¶ 24).  Plaintiff therefore contends that Defendants' failure to adequately evaluate the investment options included in the Plan had significant class-wide impact.  (*Id.*).  In addition, Plaintiff's counsel at oral argument indicated that Plaintiff had invested in one of the funds in the challenged Fidelity Active Suite.  (Doc. # 76 at 26).  The Court granted Plaintiff leave to supplement the record with this information, which Plaintiff did in the form of an affidavit filed on August 25, 2021.  (Doc. # 73-1 at 1).

Aside from the thirteen funds contained in the Fidelity Active Suite, Plaintiff takes aim at two other actively managed mutual funds offered by the Plan—the American Beacon Large Cap Value Fund and the AllianzGI NFJ Small Cap Value Fund.  (Doc. # 1 ¶¶ 39, 42).  Plaintiff alleges that the Beacon Fund severely trailed its market benchmark, and thus "Defendants' failure to replace this underachieving investment option with better performing alternatives was a breach of fiduciary duty."  (*Id.* ¶ 41).  The Allianz fund was actually removed from the Plan's investment menu in 2018, but not before it had underperformed its market benchmark "for many consecutive years."  (*Id.* ¶ 42).

In addition to criticizing the inclusion of the specific funds discussed above, Plaintiff alleges that the total amount paid in investment management fees during the relevant period was far too high.  (*Id.* ¶ 48).  Plaintiff cites statistics showing that the management fees paid as a percentage of total assets was significantly higher for the CommonSpirit Plan than those of comparable plans.  (*Id.* ¶¶ 48-49).  In Plaintiff's view, "Defendants' failure to ensure that the Plan offered a lineup that charged participants reasonable and appropriate expenses represents a profound breach of fiduciary duty."  (*Id.* ¶ 49).

Finally, the Complaint alleges that the Plan paid excessive administrative fees to Fidelity and that Defendants' failure to defray these costs was a breach of fiduciary duty.  The Complaint alleges that "[t]hroughout the Class Period, Fidelity has received compensation for its recordkeeping services as a flat fee charged at between $30 and $34 per person," which, according to Plaintiff, is higher than that of comparable plans.  (*Id.* ¶ 45).  Plaintiff contends that a plan as large as CommonSpirit's would have the bargaining power "to obtain a per-participant cost significantly lower than $30 per participant."  (*Id.*).

Count I of the Complaint sets forth Smith's breach of fiduciary duty claim in detail, including the challenges to individual investment offerings and the allegation that the Plan paid excessive investment management fees and recordkeeping fees.   In Count II, Plaintiff asserts a theory of co-fiduciary liability under 29 U.S.C. § 1105(a), that is, CommonSpirit failed to adequately monitor and oversee the conduct of the Committee, and the Committee failed to adequately monitor and oversee its members.   (*Id.* ¶¶ 75-82).  In addition, Plaintiff alleges that each of the Defendants "knowingly participated" and "enabled" the breaches of the other Defendants and "failed to make any reasonable effort under the circumstances to remedy the breaches."   (*Id.* ¶ 83).  The third and final count in the Complaint alleges that, to the extent Defendants did not act as fiduciaries under ERISA, they participated in a "knowing breach of trust" by "permitting the Plan to offer a menu of poor and expensive investment options."   (*Id.* ¶ 86).  Such a theory of liability has been held to be actionable under ERISA in cases where the defendant had "'actual or constructive knowledge' of the circumstances surrounding an underlying breach." *See Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

Defendants have moved to dismiss the Complaint in its entirety.   In the brief in support of their Motion, Defendants argue that Plaintiff lacks Article III standing to challenge Plan investment options she has not invested in. (Doc. # 38 at 12).  Defendants also argue that the allegations in the Complaint fail to state a claim.  (*Id.* at 5).  Plaintiff has filed a response in opposition, (Doc. # 43), and Defendants have replied, (Doc. # 49). With leave of Court, Defendants supplemented their reply brief with updated data on the performance of the challenged investment funds, to which Plaintiff has responded.  (Docs. # 72, 74, 75).  In addition, the parties have submitted a total of thirteen supplemental

notices of authority along with responses.  (Docs. # 50, 51, 52, 53, 54, 55, 57, 58, 61, 62, 63, 64, 65, 66, 67, 68, 70, 71).  The Court heard argument on Defendants' Motion on August 25, 2021.  (Doc. # 75).

## II.    ANALYSIS

### A.    Article III Standing

Defendants challenge Plaintiff's standing only with respect to her claim that Defendants imprudently chose investment vehicles that underperformed relative to their peers.  However, Plaintiff has alleged that she suffered injury by investing in one of the challenged funds.  As shown below, this provides Plaintiff standing to challenge not only the fund she invested in, but other similar funds alleged to have underperformed.

In order to invoke the power of a federal court, a plaintiff must present a "case" or "controversy" within the meaning of Article III of the Constitution.  This "irreducible constitutional minimum of standing" requires a showing of "injury in fact" to the plaintiff that is "fairly traceable to the challenged action of the defendant," and "likely [to] be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Where there is a facial attack on the pleadings for lack of standing, as there is here, the court "must accept the allegations set forth in the complaint as true, drawing all inferences in favor of the plaintiff."  *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019) (quoting *Galyor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014)).  "However, 'the plaintiff, as the party invoking federal subject matter jurisdiction, has the burden of persuading the court that all of the requirements necessary to establish standing to bring the lawsuit have been met.'"  *Dismas Charities, Inc. v. United*

*States DOJ*, 401 F.3d 666, 671 (6th Cir. 2005) (quoting *Courtney v. Smith*, 297 F.3d 455, 459 (6th Cir. 2002)).  Plaintiff has met this burden.

In an affidavit, Plaintiff's counsel avers that Plaintiff invested in the Fidelity Freedom 2035 Fund during the class period, (Doc. # 73-1 at 2), a fund which is included in the Fidelity Active Suite, (Doc. # 1 ¶ 28).  Plaintiff has thus alleged injury to her own Plan account which is traceable to the Defendants' conduct and which would be redressed by a favorable decision.  At oral argument, defense counsel did not dispute that Plaintiff has standing to challenge the fund that she invested in but asserted that Plaintiff would nonetheless lack standing to challenge funds that she did not invest in, including the American Beacon Fund and the Allianz Fund.  (Doc. # 76 at 27).

Contrary to Defendants' contention, Plaintiff's investment in one of the challenged funds is sufficient to confer standing to sue on behalf of plan members who invested in the remaining challenged funds.  "Courts have recognized that a plaintiff with Article III standing may proceed under § 1132(a)(2) on behalf of the plan or other participants." *Braden v. Wal-Mart, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009); *see, e.g.*, *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998).  In *Fallick*, the plaintiff brought a putative class action, alleging that his ERISA plan fiduciary improperly denied his claims for reimbursement of medical expenses.  162 F.3d at 421.  The Sixth Circuit held that the plaintiff had standing to sue not only on behalf of members of his plan, but also members of other ERISA plans where the defendant had employed the identical methodology for denying medical benefits claims.  *Id.* at 423.  Once standing has been established, the court explained, "whether a plaintiff will be able to represent the putative class, including

absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23 of the Federal Rules of Civil Procedure."  *Id.*

Like the plaintiff in *Fallick*, Smith has alleged standing vis-à-vis the Defendants and thus has standing to represent other Plan participants who allegedly suffered similar, though not identical, injury.  District courts within the Sixth Circuit have relied upon *Fallick* to reach the same outcome.  In *Cassell v. Vanderbilt University*, No. 3:16-cv-2086, 2018 WL 5264640, at *3 (M.D. Tenn. Oct. 23, 2018), for example, plaintiffs brought a class action complaint similar to Smith's, alleging that defendants had violated ERISA by offering imprudent investments to plan participants.  As in the present case, the class representatives in *Cassell* had invested in some but not all of the allegedly imprudent funds.  *Id.*  Standing was nonetheless established with respect to all the challenged funds, the court held, because "a plaintiff who is injured in his or her own plan assets—and thus has Article III standing—may proceed under Section 1132(a)(2) on behalf of the plan or other participants even if the relief sought sweeps beyond his own injury."  *Id.* (citing *Fallick*, 162 F.3d at 423); *see also Sweda v. Univ. of Pa.*, 923 F.3d 320, 334 n.10 (3d Cir. 2019) (likewise holding that allegations of investment in some of an ERISA plan's underperforming funds gave the plaintiff standing to challenge all underperforming funds offered).

Of course, "standing is not dispensed in gross," and "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Davis v. SEC*, 554 U.S. 724, 734 (2008) (quotations, alteration, and citations omitted).  Further, a plaintiff may not acquire standing merely by virtue of bringing a class action.  *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 582 (6th Cir. 2016).  But the Supreme Court

has long rejected the notion that a class representative's injury must be identical to that of absent class members.  *See Gratz v. Bollinger*, 539 U.S. 244, 262-63 (2003).  "At bottom, 'the gist of the question of standing' is whether [a plaintiff has] 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"  *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  As the First Circuit recently explained in the class action context, "the question of standing is not: Are there differences between the claims of the class members and those of the class representative? Rather, the pertinent question is: Are the differences that do exist the type that leave the class representative with an insufficient personal stake in the adjudication of the class members' claims?"  *In re Asacol Antitrust Litig.*, 907 F.3d 42, 49 (1st Cir. 2018).  Here, the answer is clearly "no."

Plaintiff has a sufficient personal stake in the adjudication of the claims relating to the American Beacon Fund and the Allianz Fund.  Those funds, like the Fidelity funds Plaintiff invested in, are alleged to have been improperly included in the Plan menu due to poor performance and high investment management fees.  All the challenged funds, moreover, are actively managed and are alleged to have underperformed passively managed index funds or market indices.  Finally, Plaintiff and members of the putative class are all participants in the same plan administered by Defendants.  The Court thus has jurisdiction over the claims relating to the challenged funds which Plaintiff has not invested in.

**B.      Defendants' Motion to Dismiss under Rule 12(b)(6)**

*1.      Standard of Review*

Upon a Rule 12(b)(6) motion to dismiss, a court may dismiss a complaint that "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  A complaint does not have to show that liability is probable, "but asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 557).  When evaluating a complaint, a court must accept all facts pled in the complaint as true.  *Id.*  It need not, however, "accept as true a legal conclusion couched as a factual allegation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Merely stating the elements of a claim is insufficient; while "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 678-79.

*2.      ERISA's Fiduciary Duty of Prudence*

Fiduciaries of ERISA-governed plans such as the one at issue in this case must adhere to certain standards.  Relevant here is the duty to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  This

statutory duty of prudence establishes "an objective standard" that focuses on "the process by which" decisions are made, "rather than the results of those decisions." *Davis v. Washington University in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020) (internal quotation marks omitted); *accord Sweda v. Univ. of Pa.*, 923 F.3d 320, 329 (3d Cir. 2019); *Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384-85 (6th Cir. 2015).

### 3.    *Failure to Select Better Performing Funds*

"A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015).   Furthermore, fiduciaries must review investments at "regular intervals" and cannot assume that an investment that was proper initially "will remain so indefinitely." *Id.* at 529 (internal quotation marks omitted).   Here, Plaintiff alleges that Defendants breached their duty of prudence by offering investment funds that performed poorly and that were far too expensive.   Plaintiff focuses her attention on three investment offerings: the Fidelity Active Suite, the American Beacon Large Cap Value Fund, and the AllianzGI NFJ Small Cap Value Fund.   Each is discussed in turn.

#### a.    **Active Suite**

Plaintiff contends that Defendants should not have selected and retained the funds within the Fidelity Active Suite because of their high cost and underwhelming performance.   As the Eighth Circuit has recently noted, "[f]or an investment-by-investment challenge like this one, a complaint cannot simply make a bare allegation that costs are too high, or returns are too low.   Rather, it 'must provide a sound basis for comparison— a meaningful benchmark.'" *Davis*, 960 F.3d at 484 (internal citation omitted) (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)).   Plaintiff relies on the

Fidelity Index Suite as a benchmark, alleging that the Active Suite fared worse in comparison and had much higher investment fees.  (Doc. # 1 ¶¶ 21-22, 25, 31, 34-37).

However, actively managed funds and passively managed index funds are not ideal comparators: "they have different aims, different risks, and different potential rewards that cater to different investors."  *Davis*, 960 F.3d at 484.  The *Davis* court thus rejected the plaintiffs' attempt to use index funds as a benchmark to show that one of the plan's actively managed investments had underperformed.  *Id.*  Such an "apples and oranges" comparison, the court said, "is not a way to show that one is better or worse than the other."  *Id.*  *Davis* therefore affirmed the district court's dismissal of the plaintiffs' imprudent-investment claim, holding that "it is not imprudent to provide options with differing features from which to choose, regardless of whether some perform better than others."  *Id.* (citing *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011)).

The Eighth Circuit's reasoning on this point is persuasive, and no circuit court, including the Sixth Circuit, has ruled to the contrary.  Moreover, a number of district courts have followed *Davis*'s reasoning to dismiss imprudent-investment claims based upon comparisons between active and passively managed funds.  *See, e.g.*, *Davis v. Salesforce.com, Inc.*, No. 20-cv-01753-MMC, 2020 WL 5893405, at *3 (N.D. Cal. Oct. 5, 2020); *Wehner v. Genentech, Inc.*, No. 20-cv-06894-WHO, 2021 WL 507599, at *9-10 (N.D. Cal. Feb. 9, 2021); *Kong v. Trader Joe's Company*, CV 20-05790 PA (JEMx), 2020 WL 7062395, at *6 (C.D. Cal. Nov 30, 2020).  Accordingly, Plaintiff has not plausibly alleged imprudence by comparing the performance of the Active Suite and the Index Suite.

Plaintiff responds by highlighting the various similarities between the Active Suite and Index Suite, which in her view makes the Index Suite "a meaningful, if not perfect, benchmark for the Active Suite." (Doc. # 43 at 25). As Plaintiff notes, the two suites are offered by the same investment management firm, share the same management team, and share "almost identical glide paths."[1] (*Id.*). However, the fact that "some similarities" exist between funds does not permit a plaintiff to "dodge the requirement for a meaningful benchmark." *Davis*, 960 F.3d at 486 (alteration omitted) (quoting in a parenthetical *Meiners*, 898 F.3d at 823). More to the point, Plaintiff does not dispute the fundamental differences between the two funds, that is, "the Active Suite's grant of discretion to select riskier and active assets and to deviate from the glide path, which is reflected in the management fees." (*Id.*). Indeed, it was the difference in management approaches between active and passively managed funds that compelled the Eighth Circuit to deem the two types of funds unsuitable comparators. *See Davis*, 960 F.3d at 484.

Plaintiff also counters by citing district court authorities from within the Sixth Circuit—two of which post-date *Davis*—that "decline to rule on the reasonableness of comparing actively managed funds to passively managed index funds on a motion to dismiss." *Miller v. Autozone, Inc.*, 2020 WL 6479564, at *4 (W.D. Tenn. Sept. 18, 2020); *accord Davis v. Magna Int'l of Am., Inc.*, 2021 WL 1212579, at *8 (E.D. Mich. Mar. 31, 2021); *Cassell v. Vanderbilt*, 285 F. Supp. 3d 1056, 1066 (M.D. Tenn. 2018). In these courts' view, allegations such as the ones Plaintiff makes in this case "require examination of particular circumstances, specific decisions and the context of those decisions," which

---

[1]     As noted in the Complaint, a "glide path" refers to changes in a fund's allocations of stocks, bonds, and cash over time. (Doc. # 1 ¶ 20).

raise "issues of fact [that] cannot be determined on a motion to dismiss." *Cassell*, 285 F. Supp. 3d at 1067.

Although these district court cases arguably support Plaintiff's position, they are not binding, and the Eighth Circuit's conflicting decision in *Davis* is more persuasive.  To start, a fiduciary is not per se imprudent for including actively managed funds alongside other types of investments in a plan menu.  *Davis*, 960 F.3d at 485; *see Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009).  In fact, a fiduciary is required to offer a diverse array of investment choices to plan participants.  *Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*, 960 F.3d 190, 196 (5th Cir. 2020) (citing 29 U.S.C. § 1104(a)(1)(C)). Offering funds with different management approaches and varying levels of risk is one way to diversity the portfolio of available investments.   Actively managed funds, for example, provide plan participants with the opportunity to take on more risk and pay higher fees in the hope of beating the market.  Other investors, particularly those with long time horizons, may prefer lower-cost index funds that offer a market-rate return.  In judging the success or failure of these funds, it would seem logical to compare their performance to that of funds with similar risk profiles and fee structures.  Viewed in this context, a plan fiduciary does not necessarily act unreasonably merely by including an actively managed fund that happens to perform worse or cost more than any given passively managed fund.  Any other conclusion would in effect prohibit plan managers from offering investment options a plaintiff views as inferior, something which courts have repeatedly held is not the law under ERISA.  *See Divane v. Nw. Univ.*, 953 F.3d 980, 989 (7th Cir. 2020), *cert. granted*, *Hughes v. Nw. Univ.*, --- S. Ct. ----, 2021 WL 2742780 (July 2, 2021); *Loomis v. Exelon Corp.*, 658 F.3d 667, 673-74 (7th Cir. 2011) (noting "the

absence from ERISA of any rule that forbids plan sponsors to allow participants to make their own choices").

Given that a plan fiduciary is not imprudent simply for offering lower-performing or higher-cost funds, a complaint that pleads as much would be conclusory and fail to state a claim. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). District courts that allow complaints of this nature to proceed to discovery thus abrogate their duty to weed out claims that lack merit as a matter of law. Furthermore, it is not unduly onerous to require plaintiffs to plead facts showing underperformance relative to a viable benchmark. "ERISA plaintiffs typically have extensive informant regarding the selected funds because of ERISA's disclosure requirements," *Meiners*, 898 F.3d at 822, and thus would reasonably be able to compare like funds without the benefit of discovery.

Nonetheless, even assuming that the Index Suite may properly be used as a comparator at this stage of the case, Plaintiff's imprudent-investment claim fails because the Active Suite did not *substantially* underperform the Index Suite. As alleged in the Complaint, the Active Suite trailed the Index Suite by less than one percent over the period from May 2015 to May 2020. (Doc. # 1 ¶ 36). Caselaw from both inside and outside of the Sixth Circuit has held that a similarly small disparity in performance between a challenged fund and its benchmark "does not support the inference that Defendants were imprudent to retain [the challenged fund] in the set of Plan offerings." *Stark v. Keycorp*, No. 1:20-cv-1254, 2021 WL 1758269, at *10 (N.D. Ohio May 4, 2021) (quoting *Patterson v. Morgan Stanley*, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *10 (S.D.N.Y. Oct. 7, 2019)); *cf. Miller*, 2020 WL 6479564, at *5-7 (denying motion to dismiss where plaintiffs alleged, among other things, that the crediting rate of the challenged fund was

2.20% less than that of a comparator); *Karpik v. Huntington Bancshares Inc.*, 2:17-cv-1153, 2019 WL 7482134, at *5 (S.D. Ohio Sept. 26, 2019) (denying motion to dismiss where it was undisputed that the challenged fund had "dramatically underperformed the market").  Plaintiff cites no caselaw to the contrary, and the Court is aware of none.

Indeed, inferring fiduciary breach based on a fund's minimal underperformance would make little sense given that "the ultimate outcome of an investment is not proof of imprudence."  *Divane*, 953 F.3d at 992 (quoting *DeBruyne v. Equitable Life Assurance Soc'y of the United States,* 920 F.2d 457, 465 (7th Cir. 1990)).  At most, then, a plan investment's underperformance is circumstantial evidence that "a prudent fiduciary in like circumstances would have acted differently."  *Meiners*, 828 F.3d at 822 (quoting *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718-19 (2d Cir. 2013)).  And a small degree of underperformance is weak circumstantial evidence that is insufficient to infer fiduciary breach.  The Eighth Circuit implicitly recognized as much in *Davis*, where the allegation that one of the plan investments "performed more poorly than [its benchmark] did over certain periods of time" was insufficient to infer breach because "fiduciaries are not required to pick 'the *best* performing fund.'"  960 F.3d at 486 (quoting *Meiners*, 828 F.3d at 923).

The allegations of breach in this case are even less plausible when considering the undisputed fact that, by 2021, the Active Suite had outperformed Plaintiff's chosen benchmark on a five-year trailing basis.  (Doc. # 72-1 at 2).  Plaintiff alleges in her Complaint that the Active Suite underperformed from 2015 to 2020, and that a reasonable fiduciary would have responded by removing the fund from the Plan menu.  Put simply, if imprudence may be inferred from a fund's underperformance over a given time period, it

17

stands to reason that *outperformance* of the same fund over the same length of time just one year later would weaken, if not negate, such an inference.  Moreover, had Defendants done what Plaintiff says would have been prudent and jettisoned the Active Suite in 2020, Plan investors would have lost out on substantial gains.  Therein lies the difficulty of reaching conclusions about a fund's quality based on snapshots of its performance over relatively short periods.  For this reason, some courts have flatly held that "allegations based on five-year returns are not sufficiently long-term to state a plausible claim of imprudence."  *Davis*, 2020 WL 5893405, at *4 (collecting cases).

To be sure, Plaintiff relies on more than simply underperformance to allege that the Defendants acted imprudently.  First, she alleges that the Active Suite experienced a significant outflow of capital during the relevant period, indicating decreased interest in the funds from outside investors.  (Doc. # 1 ¶ 34).  Plaintiff also alleges that the Active Suite had a four-star rating from Morningstar, while the Index Suite had a five-star rating. (*Id.* ¶ 35).  Yet, in a report cited in Plaintiff's Complaint at paragraph 34, it is apparent that the Active Suite remained significantly more popular than the Index Suite as late as 2018 and was the second-most popular target-date fund in the entire industry by market share. (Doc. # 38-9 at 45).  Furthermore, the same report shows that the Active Suite scored more highly than the Index Suite in another of Morningstar's rating systems.  (*See* Doc. # 38-9 at 45).  Thus, the source Plaintiff relies upon ultimately undermines her allegations that a reasonably prudent fiduciary would have dropped the Fidelity Active Suite from its fund lineup.  More fundamentally, however, Defendants were not obligated to choose the best fund available or to favor passively managed funds over actively managed funds,

*Davis*, 960 F.3d at 485, and for these reasons, were not bound by Morningstar's fund rankings or generalized investor preference, *see Patterson*, 2019 WL 4934834, at *11.

### b.    American Beacon Small Cap Value Fund

Plaintiff's claim with respect to the American Beacon Fund is slightly different, but fails nonetheless.  Instead of using an index fund of her choosing as a benchmark, Plaintiff uses the benchmark listed in the fund's prospectus—the Russell 1000 Value Index—to allege that the fund performed poorly.  (Doc. # 1 ¶ 39).  Plaintiff alleges that as of May 2020, the American Beacon Fund underperformed the Russell Index by 1.58% in the previous five years and .78% over the previous ten years.  (Doc. # 1 ¶ 40).  Furthermore, Plaintiff alleges that Defendants acted imprudently by failing to replace the American Beacon Fund with the Vanguard Russell 1000 Value Index Fund, which tracks the Russell Index and has a much lower cost (featuring an expense ratio of .07% versus .63% for the American Beacon Fund).  (*Id.* ¶ 41).

As with her challenge to the Active Suite, Plaintiff's challenge to the American Beacon Fund falls short because Plaintiff has failed to provide a "meaningful benchmark" showing underperformance.  The Eighth Circuit in *Davis* held that a market index listed in the plan's fee disclosures was not a "meaningful benchmark" for an actively managed fund.  *Davis*, 960 F.3d at 485 n.4.  The court reasoned that the market index (in that case the Russell 3000) "is not a fund, much less an actively managed one."  *Id.*  Under this reasoning, the Russell 1000 Value Index is an unsuitable comparator.

In addition, Plaintiff's claim runs into the same hurdle as the Active Suite claim regarding substantial underperformance.  As mentioned, caselaw suggests that a 1.58% disparity between a fund's performance and its benchmark would be insufficient to

plausibly allege imprudence.  *See Patterson*, 2019 WL 4934834, at *10; *cf. Miller*, 2020 WL 6479564, at *5-7.

The second aspect of this claim—that Defendants should have replaced the American Beacon Fund with the Vanguard Russell 1000 Value Index Fund—also lacks merit.  As discussed at length, the higher cost or underperformance of an actively managed fund relative to an index fund says nothing about the relative merit of the two funds.  In any event, although the difference in expense ratio between these funds is significant, Plaintiff neglects to allege how the Russell Index Fund performed relative to the American Beacon Fund.  At bottom, fund expenses matter because they reduce an investor's return.  (*See* Doc. # 1 ¶¶ 26, 31-33).  Thus, without knowing how the relatively lower fees impacted the Russell Index Fund's profitability, Plaintiff has not plausibly alleged that Defendants acted unreasonably by not offering that fund in place of the American Beacon Fund.

### c.    AllianzGI NFJ Small Cap Value Fund

Plaintiff has also failed to state a claim that Defendants breached their duty of prudence by failing to timely replace the underperforming AllianzGI Fund.  Defendants ceased offering the fund in 2018, but according to Plaintiff, it "had been consistently and substantially underperforming its benchmark, the Russell 2000 Value Index, for many consecutive years and should have been jettisoned from the Plan's investment menu long before it was ultimately removed."  (Doc. # 1 ¶ 42).

Once again, by comparing he performance of the AllianzGI fund to a market index, Plaintiff has failed to show that the AllianzGI Fund underperformed a meaningful benchmark.  *See Davis*, 960 F.3d at 485 n.4.  This deficiency notwithstanding, it is true

the AllianzGI Fund underperformed the Russell 2000 index by 3.87% for a five-year period ending in 2016, (*id.* ¶ 44), far worse than the relative underperformance of the Active Suite and the American Beacon Fund.  But unlike with those funds, the AllianzGI fund was removed two years later in 2018, suggesting that Defendants reasonably monitored its performance.  Moreover, as shown in the Plan's fee disclosure document (and which Plaintiff does not dispute), the Allianz fund was outperforming its benchmark by 1.61% on a ten-year basis by the end of 2016.[2]  (Doc. # 38-10 at 12).  The court in *Patterson* rejected a similar argument that the plan fiduciary had been late to remove an underperforming fund when the fund had been outperforming its benchmark on a ten-year trailing basis up until three years earlier.  *See* 2019 WL 4934834, at *11.

Because Plaintiff has failed to allege facts plausibly showing that the challenged investment funds were imprudently selected or retained, her claim on this basis is **dismissed**.

### 4.   *Overly Expensive Investment Menu*

In paragraph 48 of her Complaint, Plaintiff alleges that the Plan's "investment menu was considerably more expensive than those of comparable plans."  As Defendants point out, the Seventh Circuit appears to have rejected this very argument under similar facts.  In *Divane v. Northwestern University*, the plaintiff alleged that the defendant had breached its fiduciary duties by providing too many expensive investment options relative to low-cost index funds.  953 F.3d at 991.  The Seventh Circuit held that the plan's inclusion of low-cost index funds for participants to invest in "eliminat[ed] any claim that plan

---

[2]     The Court will take judicial notice of Plan fee disclosure documents because they are publicly available, and Plaintiff does not dispute their authenticity.  *See* Fed. R. Evid. 201; *see, e.g.*, *Johnson v. Providence Health & Servs.*, 2018 WL 1427421, at *3 (W.D. Wash. Mar. 22, 2018).

participants were forced to stomach an unappetizing menu." *Id.*  Here, as in *Divane*, it is undisputed that the Plan at issue offered several low-cost index funds—five in total. (Doc. # 38-8 at 12-16).  Thus, under the reasoning in *Divane*, Plaintiff's claim would fail.

In her brief, Plaintiff insists that she is advancing a different theory than the one which was rejected in *Divane*.  (Doc. # 43 at 33).  Plaintiff now asserts that her objection is to the "aggregate amount of investment management fees paid out rather than the range of the investment options' expense ratios." (*Id.*).  The Complaint includes statistics showing that the Plan paid out investment management fees of .54% of its total assets in 2017 and .45% of total assets in 2018.  (Doc. # 1 ¶ 48).  According to a Brightscope/ICI study cited in the Complaint, an average plan in 2016 with assets over $1 billion paid out a mere .28% of total assets to cover total plan costs ("TPC"), which include investment management fees as well as recordkeeping fees.  (*Id.* ¶ 49).  Thus, Plaintiff alleges that the Plan's overall expense ratio is at least double the average for comparable plans.  (*Id.*). From this allegation, Plaintiff urges the inference that Defendants violated their duty of prudence by either neglecting to notice the problem of higher-than-average fee payments and/or failing to address the problem by using its bargaining power to negotiate better rates.  (*Id.* ¶¶ 4, 48-49).

Assuming that Plan-wide investment management fees are higher than average, this fact alone does not create an inference that Defendants breached their duty of prudence.  Unlike with recordkeeping costs (addressed below), which are assessed to plan participants through a flat fee, investment-management fees vary based on the type of investment chosen.   Accordingly, the Seventh Circuit in *Divane* and the Third Circuit in *Sweda* each stated that "any 'breach claim must be examined against the backdrop of

the mix and range of available investment options.'" *Divane*, 953 at 991 (quoting *Sweda*, 923 F.3d at 330).  Here, it is undisputed that the Plan offered almost thirty investment choices, including five index funds, with expense ratios that ranged between .02% and .82%.  (Doc. # 38-8 at 12-16).  The Seventh Circuit has held that a similar mix and range of investment options in a plan menu offered meaningful choice to plan participants.  *See Loomis*, 658 F.3d at 669-71 (rejecting imprudence claim involving a plan with 32 investment options and expense ratios ranging from .03% to .96%).  Defendants therefore satisfied their obligations under ERISA.  *See Divane*, 953 F.3d at 991 n.10; *Hecker*, 556 F.3d at 586.

Notably, despite the availability of low-cost options, Plaintiff's own allegations suggest that CommonSpirit's Plan participants overwhelmingly preferred higher-cost funds.  As noted in the Complaint, approximately 76% of Plan assets were invested in the Fidelity Active Suite alone.  (Doc. # 1 ¶ 24).  Accordingly, to the extent the Plan's total investment management fees exceeded the industry average, it is explained by participant preference, not fiduciary breach.

The Court recognizes that "a meaningful mix and range of investment options does not insulate plan fiduciaries from liability for breach of fiduciary duty" and instead must be measured against a fiduciary's overall performance.  *Divane*, 953 F.3d at 992 (quoting *Sweda*, 923 F.3d at 330).  As the Third Circuit put it, a standard based solely on the number and variety of investment options provided "would allow a fiduciary to avoid liability by stocking a plan with hundreds of options even if the majority were overpriced or underperforming."  *Sweda*, 923 F.3d at 330.  Yet, nowhere in the Complaint does Plaintiff allege that the funds offered were more costly or performed worse than

23

comparable funds.  By contrast, in *Sweda*, where the Third Circuit reversed a dismissal at the pleading stage, the plaintiff made several allegations of this nature, including that "60% of [p]lan options underperformed appropriate benchmarks" and that "some options in the [plan] line-up had layers of unnecessary fees."  *Id.* at 331.  The plaintiff in *Sweda* also alleged that, "despite the availability of low-cost institutional class shares, [the fiduciary] selected and retained identically managed but higher cost retail class shares." *Id*.  The plaintiff even went so far as to include a table "comparing options in the [p]lan with readily available cheaper alternatives."  *Id.*

Other circuit courts that have allowed claims of excessive investment fees to survive the pleading stage have likewise done so based on allegations that the plan fiduciary offered more expensive share classes while cheaper ones were available for the same fund.  *See Davis*, 960 F.3d at 483; *Braden*, 588 F.3d at 595.  But in the present case, Plaintiff expressly disclaims reliance on such a theory, writing in her brief that "Plaintiff never alleges that Defendants failed to use the least expensive share class." (Doc. # 43 at 30).

In sum, Plaintiff's sole allegation that the total amount of investment management fees paid was higher than average is insufficient to plead a claim that Defendants violated the fiduciary duty of prudence.  Plaintiff's claim on this basis is therefore **dismissed**.

### 5.    *Excessive Recordkeeping Costs*

"Another obvious indicator of Defendants' breach," says Plaintiff, "is the Plan's excessive recordkeeping costs."  (Doc. # 1 ¶ 45).  "[A] fiduciary's failure to ensure that record-keepers charged appropriate fees and did not receive overpayments may be a

violation of ERISA." *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1065 (M.D. Tenn. 2018); *accord Sweda*, 923 F.3d at 328.

Here, Plaintiff alleges that, during the relevant period, the Plan paid Fidelity a flat fee of $30 - $34 per person for recordkeeping services.  (Doc. # 1 ¶ 45).  Plaintiff cites in her Complaint the 401(k) Averages Book (20th ed.), an industry publication purportedly showing that plans with 100 participants and $5 million in assets in the year 2017 paid on average $35 per participant for both recordkeeping and administrative fees.  (*Id.*).  Plaintiff claims that given its much larger size and resultant negotiating power, and "with prudent management and administration, the Plan would have unquestionably been able to obtain a per-participant cost significantly lower than $30 per participant."  (*Id.*).

In the brief supporting their Motion to Dismiss, Defendants challenge the statistics Plaintiff cites, arguing that Plaintiff misrepresented the data in the 401(k) Averages Book to underestimate the average cost of recordkeeping.  (Doc. # 38 at 27).  Specifically, Defendants state that the 2017 per-person average as reported in the source is $40, not $35, and that this dollar amount is in addition to revenue sharing (averaging $320 per person) that is also used to pay for recordkeeping services.[3]  (*Id.* at 27-28 & n.19) (citing Doc. # 38-11 at 5-7).  Thus, on Defendants' reading of the 401(k) Averages Book, the average cost per person for recordkeeping is $360 per participant, far greater than the amount charged in CommonSpirit's Plan.  (*Id.* at 28).  Plaintiff in her response brief does not quibble with Defendants' interpretation of the statistics in the 401(k) Averages Book

---

[3]     As described in *Divane*, revenue sharing is "a common practice in which service providers of mutual funds share a percentage of the fees they receive with the administrative-service provider of a particular plan which can help defray participants' recordkeeping and other administrative costs."  953 F.3d at 989 n.9 (internal ellipsis omitted) (quoting Amicus Br. for the U.S. Chamber of Commerce).

and instead criticizes Defendants for failing to "aggregate the Plan's per-participant fee with the Plan's revenue-sharing payments to make it a fair comparison."  (Doc. # 43 at 34).  The Plan's Form 5500, which is cited in the Complaint, reveals that the Plan uses revenue sharing to partially defray recordkeeping costs.  (Doc. # 38-7 at 7).  But Plaintiff does not provide information about how much is paid to cover recordkeeping fees through revenue sharing.  Thus, it is unclear how much the Plan pays in total recordkeeping fees and how that amount stacks up against the average recordkeeping cost listed in the 401(k) Averages Book.

Plaintiff next attempts to show inflated recordkeeping costs by relying on the earlier-discussed Brightscope/ICI study showing that an average plan in 2016 paid out .28% of its assets to cover total plan costs ("TPC")—which includes recordkeeping and investment-management fees—while the CommonSpirit Plan paid out .54% of plan assets for investment-management fees alone.  (Doc. # 43 at 34-35).  Plaintiff asserts that the .54% of Plan assets paid in investment-management fees reflects the amount paid in recordkeeping fees insofar as investment fees "incorporate the revenue-sharing that is used to pay for recordkeeping."  (Doc. # 43 at 34).  Unfortunately, these statistics raise more questions than they answer.  First, Plaintiff provides no indication as to how the .54% of plan assets paid by the CommonSpirit Plan or the .28% of TPC paid by an average plan is divided between management fees and recordkeeping fees.  Nor is it clear what percentage of recordkeeping fees was paid through revenue sharing versus per-participant and other flat fees.  Plaintiff herself admits that "with respect to the Plan's recordkeeping costs, it is unknown which proportion of the fees charged from investment

26

expenses are actually attributable to investment management services, as opposed to administrative services . . . ."  (Doc. # 43 at 13 n.5).

In sum, a close examination of the sources cited in the Complaint reveals that Plaintiff has failed to allege facts showing that the recordkeeping fees exceeded those of comparable plans or were excessive in relation to the service provided.  Further, Plaintiff has failed to identify another recordkeeper that would have been willing to conduct the same service as Fidelity at the assertedly reasonable rate of $30 per person.   As Defendants observe, "[c]ourts regularly dismiss imprudence claims such as these for failing to allege an adequate market comparison."  *Kong v. Trader Joe's Company*, No. CV 20-05790 PA (JEMx), 2020 WL 7062395, at *5 (C.D. Cal. Nov 30, 2020); *see Divane*, 953 F.3d at 991 ("Plaintiffs have identified no alternative recordkeeper that would have accepted such a low fee or any fee lower than what was paid to Fidelity and TIAA."); *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (affirming dismissal of excessive recordkeeping fee claim where plaintiffs "fail[ed] to allege that the fees were excessive relative to the services rendered" (internal quotation marks omitted)); *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-cv-6685 (ALC), 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019) ("Plaintiff did not compare the Plan's record keeping service to an alternative a prudent fiduciary would have selected or provide any additional facts to support their assertion that the administrative fees were excessive."); *White v. Chevron Corp.*, No. 16-cv-0793-PJH, 2016 WL 4502808, at *15 (N.D. Cal. Aug. 29, 2016) (granting motion to dismiss where the plaintiffs "alleged no facts suggesting that the Plan fiduciaries could have obtained less-expensive recordkeeping services").

The plaintiff in *Sweda*, on the other hand, alleged facts that clearly demonstrated that plan recordkeeping costs were excessive.  For instance, the complaint in that case alleged that "the Plan paid between $4.5 and 5.5 million in annual recordkeeping fees at a time when similar plans paid $700,000 to $750,000 for the same services."  923 F.3d at 330.  The plaintiff in *Sweda* also alleged that the fiduciary failed to assess the reasonableness of plan recordkeeping fees by soliciting competitive bids, and cited examples from four other university plans that had done so successfully.  *Id.* at 331.

Similarly, in *Stark v. Keycorp*, the Northern District of Ohio allowed a claim of excessive recordkeeping fees to proceed to discovery where the plaintiffs alleged that the plan fiduciary "could have obtained comparable administrative services at a significantly reduced cost from at least three different vendors" and that these vendors "could have provided comparable recordkeeping and related administrative services in terms of scope and quality."  2021 WL 1758269, at *7.  The court in *Stark* distinguished *Divane*, *Ferguson*, and *White* (cited above) on the basis that the plaintiffs in those cases, like Plaintiff here, "failed to identify alternative administrative providers that would have provided the same service for less."  *Id.*

Because Plaintiff has failed to allege facts plausibly showing that the recordkeeping fees paid were excessive, it makes no difference that she alleges Defendants "engaged in no examination, comparison, or benchmarking of the Plan's recordkeeping fees with similarly sized plans," or "that the marketplace for service providers [is] very competitive" such that Defendants should have negotiated a better rate. (Doc. # 43 at 35) (citing Doc. # 1 at ¶¶ 4, 46, 49 n.20).

For these reasons, Plaintiff's duty-of-prudence claim related to excessive recordkeeping fees is **dismissed**.

### 6.   *Duty of Loyalty*

Plaintiff has failed to state a claim that Defendants breached their duty of loyalty. Under ERISA's duty of loyalty, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . and . . . defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1).

Plaintiff's loyalty claim must be dismissed because the Complaint does not differentiate between Defendants' alleged violations of the duties of prudence and loyalty. It is well established that "[t]o state a loyalty-based claim under ERISA, a plaintiff must do more than simply recast purported breaches of the duty of prudence as disloyal acts." *Cassell*, 285 F. Supp. 3d at 1062; *accord In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 115 (S.D.N.Y. 2018).  Although Plaintiff clearly attempts to plead both theories, none of her factual allegations support an inference that Defendants acted for the purpose of providing benefits to third parties or themselves, as required for a showing of disloyalty under ERISA.  *Cassell*, 285 F. Supp.3d at 1062.

Plaintiff disputes this characterization of the Complaint, and points to allegations that Fidelity is both the provider of the funds in the challenged Active Suite and the service provider for the Plan.  (Doc. # 43 at 37) (citing Doc. # 1 ¶¶ 21, 45).  Plaintiff further asserts that "Defendants' decision to retain the Active Suite, which pays Fidelity at higher rates than the Index Suite and more than any non-Fidelity investment option despite its consistent underperformance, can be plausibly traced to the motivation to keep Fidelity

satisfied at the expense of the participants' interests." (*Id.*).  Notwithstanding the fact that Plaintiff alleges this ill-motive for the first time in her brief, allegations that "various third parties benefitted from Defendants' alleged mismanagement" do not support an inference that "Defendants acted *for the purpose* of benefitting those third parties or themselves." *Cassell*, 285 F. Supp.3d at 1062 (emphasis in original).  Thus, Plaintiff's duty-of-loyalty claim is **dismissed**.

### 7.     Derivative Claims (Counts II and III)

Plaintiff brings a derivative claim that Defendants violated their duty to monitor fiduciaries in violation of 29 U.S.C. §§ 1109(a) and 1132(a)(2). (Doc. # 1 ¶¶ 75-83).  When an ERISA fiduciary appoints another fiduciary, courts have recognized a limited duty to monitor the appointed fiduciary's performance.  *See Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1466 n.10 (4th Cir. 1996); *In re Morgan Stanley ERISA Litig.*, 696 F. Supp. 2d 345, 366 (S.D.N.Y. 2009).  However, a monitoring claim must be dismissed where, as here, the underlying breach by the appointed fiduciary is not sufficiently pled. *See, e.g.*, *Saumer v. Cliffs Nat. Res. Inc.*, No. 1:15-cv-954-DAP, 2016 WL 8668509, at *8 (N.D. Ohio Apr. 1, 2016) (collecting cases), *aff'd*, 853 F.3d 855 (6th Cir. 2017).  This claim is accordingly **dismissed**.

The same goes for Plaintiff's other two derivative claims—(1) co-fiduciary liability under section 405 of ERISA, (Doc. # 1 ¶ 83), and (2) knowing breach of trust by non-fiduciaries, (*id.* ¶¶ 85-86).  A complaint that fails to state a claim for breach of fiduciary duty necessarily fails to state a claim for co-fiduciary liability.  *See, e.g., Izzarelli v. Rexene Prods. Co.*, 24 F.3d 1506, 1525 n.34 (5th Cir. 1994).  Likewise, an invalid breach-of-

fiduciary-duty claim forecloses a claim for breach of trust.  *Bernaola v. Checksmart Fin. LLC*, 322 F. Supp. 3d 830, 842 (S.D. Ohio 2018).  These claims are thus also **dismissed**.[4]

## III.   CONCLUSION

Accordingly, for the reasons set forth herein,

**IT IS ORDERED** as follows:

(1)   Defendants' Motion to Dismiss (Doc. # 38) is **GRANTED**;

(2)   Plaintiff's Complaint (Doc. # 1) is **DISMISSED WITH PREJUDICE**; and

(3)   This matter is **STRICKEN** from the Court's active docket.

A Judgment in favor of Defendants will be entered contemporaneously herewith.

This 8th day of September, 2021.



Signed By:

*David L. Bunning*

**United States District Judge**

J:\DATA\ORDERS\Cov2020\20-95 MOO Granting MTD.docx

---

[4]   In a footnote of her response brief, Plaintiff writes that should the Court "find the claims and allegations against Defendants deficient in any manner, Plaintiff respectfully requests leave to amend to cure any such deficiencies."  (Doc. # 43 at 39 n.36).  This throwaway statement is insufficient to meet the "justice so requires" standard for amendment under Federal Rule of Civil Procedure 15.  The Sixth Circuit has repeatedly held that "a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)."  *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 699 (6th Cir. 2004)).  Thus, in these situations, there is no "motion" to rule on, and the district court does not abuse its discretion by refusing to allow the plaintiff to amend her complaint.  *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2017); *Gonzalez v. Kovacs*, 687 F. App'x 466, 470-71 (6th Cir. 2017).  This is especially so in cases such as this one, where the plaintiff has not filed a proposed amended complaint.  *Kuyat*, 747 F.3d at 444.  For these reasons, Plaintiff will not be permitted to amend her Complaint.